FILED
2011 Nov-10 PM 04:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | |
|---|---|
| MIKE VALLONE, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) **Civil Action No. CV-09-S-178-NW** |
| | ) |
| WHITESELL CORPORATION, | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Mike Vallone, asserts a claim against Whitesell Corporation, his

former employer, for collection of unpaid wages and benefits pursuant to the Worker

Adjustment and Retraining Notification Act of 1988, 29 U.S.C. § 2101 *et seq.* ("the

WARN Act").[1]  The case currently is before the court on defendant's motion for

summary judgment.[2]  Upon consideration of the motion, briefs, and evidentiary

submissions, the court concludes the motion is due to be granted, and all of plaintiff's

claims are due to be dismissed with prejudice.

### I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary

judgment if the  movant shows that there is no genuine dispute as to any material fact

---

[1] *See* doc. no. 1 (Complaint).  The case has a unique procedural history, which will be discussed more fully in § II, *infra.*

[2] Doc. no. 26.

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In

other words, summary judgment is proper "after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all

reasonable inferences in favor of the party opposing summary judgment." *Chapman*

*v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v.*

*City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).   Inferences in favor of the

non-moving party are not unqualified, however.  "[A]n inference is not reasonable if

it is only a guess or a possibility, for such an inference is not based on the evidence,

but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692

F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat
> summary judgment unless that factual dispute is material to an issue
> affecting the outcome of the case.  The relevant rules of substantive law
> dictate the materiality of a disputed fact.  A genuine issue of material
> fact does not exist unless there is sufficient evidence favoring the
> nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. PROCEDURAL HISTORY

Plaintiff, Mike Vallone, filed the complaint in this case on January 29, 2009, on behalf of himself and a class of similarly situated individuals.[3]   At that time, plaintiff was represented by multiple attorneys.[4]   Plaintiff alleged that he was employed by defendant, Whitesell Corporation ("Whitesell" or "defendant") at its Florence, Alabama, facility until November 4, 2008, when he and up to sixty-five other similarly situated employees were terminated as part of a mass layoff or plant closing.[5]   Defendant allegedly failed to provide plaintiff and the other similarly situated employees sixty days' advance written notice of their impending terminations in violation of the WARN Act, and it also allegedly failed

> to pay the Plaintiff and the other similarly situated former employees their respective wages, salary, commissions, bonuses, accrued holiday pay vacation which would have accrued for sixty (60) days following their respective terminations without notice and failed to make 401(k) contributions and provide them with health insurance coverage and other employee benefits.[6]

On November 16, 2009, before any substantial activity had occurred in the

---

[3] Complaint, at 1.

[4] *Id.* at 7.

[5] *Id.* at ¶¶ 4-9.

[6] *Id.* at ¶¶ 10-12.

case, the court entered an order permitting plaintiff's attorneys to withdraw from representation of him due to "[s]erious and irreconcilable differences" causing "an irremediable breakdown in the attorney-client relationship."[7] From that date, plaintiff proceeded with his claims *pro se*. Plaintiff was permitted an opportunity to conduct discovery on class issues and file a motion for class certification,[8] but he did not do so. Accordingly, the court ordered that the case would proceed as to plaintiff's individual claims only, and allowed a period of discovery on those claims.[9]

Defendant's motion for summary judgment was filed on March 23, 2011, and plaintiff had until April 13, 2011 to file a response to that motion.[10] Plaintiff did not file a response. However, on June 24, 2011, more than two months after his response deadline expired, plaintiff filed a "request for deadline extension," asking the court to extend all remaining deadlines because he had been given "insufficient time" to respond to defendant's motion for summary judgment.[11] The court denied plaintiff's motion for extension on June 28, 2011, because plaintiff had not demonstrated good cause for his failure to respond to the motion for summary judgment, and because all

---

[7] Doc. no. 14 (order granting motion to withdraw), at 1 (bracketed alteration in original).

[8] *See* doc. no. 20 (Scheduling Order Regarding Class Action Certification Issue).

[9] *See* doc. no. 21 (order stating that the case would proceed only as to plaintiff's individual claims); doc. no. 25 (Scheduling Order).

[10] *See* text order entered on March 23, 2011, setting deadlines for responses and replies to defendant's motion for summary judgment.

[11] Doc. no. 29.

other pretrial deadlines (for filing final witness and exhibit lists, etc.) already had

been stayed by prior order.[12]

Defendant's motion for summary judgment now is ready for decision.  As

plaintiff never filed a response to the motion, the court will evaluate the motion solely

on the basis of defendant's original brief, evidentiary submission, and reply brief.[13]

Even so, summary judgment will not be granted by default.  *See Trustees of the*

*Central Pension Fund of the International Union of Operating Engineers and*

*Participating Employees v. Wolf Crane Service, Inc.,* 374 F.3d 1035, 1039 (11th Cir.

2004) (holding that "summary judgment cannot be granted as a sanction for merely

failing to file a response to a motion for summary judgment").  Instead, the court will

carefully evaluate the merits of defendant's motion, considering all the evidence of

record and the arguments advanced by the parties.

### III. SUMMARY OF FACTS[14]

During the ninety-day period before and after November 4, 2008, Whitesell

was a supply chain solutions company, involved in manufacturing and providing a

---

[12] Doc. no. 30.  *See also* text order entered on June 15, 2011, staying all remaining pretrial and trial deadlines pending a ruling on defendant's motion for summary judgment.

[13] The reply brief is doc. no. 27.

[14] Plaintiff did not submit any evidence in opposition to summary judgment.  Therefore, the only evidence in the record is that submitted by defendant.

variety of manufactured metal form components, as well as product distribution.[15]

Whitesell operated a number of different facilities in several states, including Alabama.[16]

Plaintiff was employed at Whitesell's Avalon facility in Muscle Shoals, Alabama. The Avalon fcility specialized in the manufacture of small fasteners such as screws. On November 4, 2008, thirty-seven of the 121 employees at the Avalon facility (including plaintiff) were laid off. No other employees at the Avalon facility were permanently laid off during the ninety-day period before and after November 4, 2008.[17]

Whitesell also operated several other facilities in Alabama. The International Distribution Center ("IDC") was located in Tuscumbia, Alabama, approximately ten miles from the Avalon facility. The IDC carried out two purposes: cold forge

---

[15] Doc. no. 26, Exhibit A (Declaration of R.R. Wiese), at ¶¶ 3-4. All factual references, unless otherwise specified, will be to the ninety-day period before and after November 4, 2008. As discussed more fully below, while the relevant time period for determining whether a mass layoff occurred under the WARN Act is thirty days, *see* 29 U.S.C. § 2101(a)(3), the relevant time period for determining whether two or more locations should be aggregated to form a "single site of employment" is ninety days. *See* 29 U.S.C. § 2102(d). Defendant used a ninety-day time frame when presenting employment and layoff figures for its relevant facilities, and the court has used defendant's evidence when finding the facts herein. Of course, if the requisite number of layoffs did not occur during a ninety-day period surrounding a certain date, the requisite number also could not have occurred within a thirty-day period surrounding that same date. Thus, the court has used defendant's ninety-day figures even when the relevant time period under the WARN Act is thirty days.

[16] Wiese Declaration, at ¶ 4.

[17] *Id.* at ¶ 5.

manufacturing of large steel pins for the mining, trailer, and agricultural industries,

and distribution.  On November 4, 2008, seven of the IDC's thirty-seven employees

were laid off.  No other employees were permanently laid off from the IDC during the

ninety-day period before and after November 4, 2008.[18]  The Whitesell Supply

facility, which was located approximately one mile from the Avalon facility, was a

wholesale sales and distribution center.  On November 4, 2008, a total of fourteen

employees worked at Whitesell Supply, and none of those employees were laid off

during the ninety-day period before and after November 4, 2008.[19]  The Avalon, IDC,

and Whitesell Supply facilities all had separate workers who did not share any

facilities, machines, mechanical equipment, or offices.  The three facilities also did

not share staff or operational purposes, and their respective day-to-day operations

were managed independently.[20]

Whitesell also employed five salespeople throughout the State of Alabama.

None of those salespeople were laid off during the ninety-day period before and after

November 4, 2008.[21]

Additionally, Whitesell employed nineteen employees at various sites across

---

[18] *Id.* at ¶ 6.

[19] *Id.* at ¶ 7.

[20] *Id.* at ¶ 8.

[21] Wiese Declaration, at ¶ 9.

the country through its Whitesell Managed Inventory ("WMI") division.  All nineteen

WMI employees were laid off on November 4, 2008.  However, "these individuals

were not employed at and did not daily or ever report to any Alabama facility for

work or ever punch in or out at any Alabama facility."[22]  Further, with regard to WMI

employees, Whitesell's Chief Operation Officer stated the following in his

declaration:

> 11.   During the relevant time period, each of the WMI
> employees reported to work at his or her office/warehouse located in
> various customer facilities in various states across the nation.  They did
> not pay Alabama taxes, their worker's compensation insurance was
> maintained in the state in which he or she worked, and they became
> eligible for unemployment benefits in the state in which they were
> employed — not in Alabama.  Each WMI employee had a fixed place of
> work that was the office/warehouse to which they reported on a daily
> basis, none of which were in Alabama.  They also performed duties
> separate and distinct from any work performed at any Alabama facility.
> Their pay and time was based on their work and attendance at their
> office/warehouse and none of that was located in Alabama.
>
> 12.   During the relevant time period, at each of the locations in
> which WMI employees worked, there was a WMI site manager.  That
> site manager hired and fired the WMI employees, took attendance,
> reported hours, disciplined, set the hours, and assigned the tasks and
> duties of each employee.  Site managers directed their employees based
> on requests from the on-site customer; they did not receive day to day
> tasks, assignments, direction , or instruction from anyone at the Avalon
> manufacturing site.  Even if additional product was needed, the site
> managers ordered that from the International Distribution Center
> ("IDC") facility, not the Avalon plant.

---

[22] *Id.* at ¶ 10.

13.    During the relevant time period, each of the hourly WMI employees — line workers, forklift operators, receiving personnel — reported to the site manager at each respective location.  The remote site managers reported to the WMI manager, who maintained his office at the IDC facility, not the Avalon manufacturing plant.  Performance evaluations of WMI employees were completed at each separate site location by that site's manager.  Evaluations of the remote site managers were conducted at the remote site by the WMI manager traveling to the remote site from his office at the IDC Alabama facility.  The WMI manager, in turn, reported to the Director of Distribution and Logistics, also located at the IDC facility.[23]

## IV. DISCUSSION

The WARN Act "obligates certain employers to give workers or their union 60 days' notice before a plant closing or mass layoff.  If an employer fails to give the notice, the employees may sue for backpay for each day of the violation, and, in the alternative, the union is ostensibly authorized to sue on their behalf." *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 545-56 (1996) (citing *North Star Steel Co. v. Thomas*, 515 U.S. 29 (1995)).  More specifically, the WARN statute provides, in pertinent part:

> An employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order —
>
> > (1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee . . . .

---

[23] *Id.* at ¶¶ 11-13.

29 U.S.C. § 2102(a)(1).

> Any employer who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for —
>
>> (A) back pay for each day of violation at a rate of compensation not less than the higher of —
>>
>>> (i) the average regular rate received by such employee during the last 3 years of the employee's employment; or
>>>
>>> (ii) the final regular rate received by such employee; and
>>
>> (B) benefits under an employee benefit plan described in section 1002(3)[24] of this title, including the cost of medical expenses incurred during the employment loss which would have been covered under an employee benefit plan if the employment loss had not occurred.
>
> Such liability shall be calculated for the period of the violation, up to a maximum of 60 days, but in no event for more than one-half the number of days the employee was employed by the employer.

29 U.S.C. § 2104(a)(1).

The WARN Act defines the term "employer" as "any business enterprise that

employs — (A) 100 or more employees, excluding part-time employees; or (B) 100

---

[24] Section 1002 is part of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* The portion of that statute cited here defines the term "employee benefit plan" or "plan" as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C. § 1002(3).

or more employees who in the aggregate work at least 4,000 hours per week

(exclusive of hours of overtime).  29 U.S.C. § 2101(a)(1).  The term "plant closing"

is defined as

> the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees.

29 U.S.C. § 2010(a)(2).  The term "mass layoff" is defined as

> a reduction in force which —
>
> > (A) is not the result of a plant closing; and
>
> > (B) results in an employment loss at the single site of employment during any 30-day period for —
>
> > > (i)     (I) at least 33 percent of the employees (excluding any part-time employees); and
> > >
> > > > (II) at least 50 employees (excluding any part-time employees) or
> > >
> > > (ii) at least 500 employees (excluding any part-time employees).

29 U.S.C. § 2101(a)(3).  The term "affected employees" is defined as "employees

who may reasonably be expected to experience an employment loss as a consequence

of a proposed plant closing or mass layoff by their employer."   29 U.S.C. §

2101(a)(5).  The term "employment loss" includes "a layoff exceeding 6 months."

29 U.S.C. § 2101(a)(6)(B).

Defendant's argument in support of summary judgment is that the WARN Act simply does not apply to plaintiff's claims. Whitesell does not dispute that it is an "employer" covered by the WARN Act, because it employs more than 100 employees.[25] *See* 29 U.S.C. § 2101(a)(1). Furthermore, there is no contention that plaintiff was involved in a "plant closing" under 29 U.S.C. § 2102(a)(1), because the Avalon facility, where plaintiff worked, was not shut down.[26] Instead, defendant contends that the protections of the WARN Act were not triggered because there was no "mass layoff" at the Avalon facility.

To prove that a "mass layoff" occurred pursuant to § 2102(a)(1), plaintiff would have to show either: that at least 500 employees were laid off at a single employment site during a thirty-day period; or that at least fifty employees were laid off at a single employment site during a thirty-day period, and that those fifty employees constituted at least 33 percent of the employees at that site. *See* 29 U.S.C. § 2101(a)(3).

There is no evidence that at least 500 employees were laid off from plaintiff's work site during a thirty-day period. Plaintiff did not even make such an allegation

---

[25] *See* doc. no. 26, at 6-7 n.3 ("Whitesell does not dispute that it had more than 100 employees company-wide.").

[26] *Id.* at 6 n.2 ("As plaintiff's employment site was not shut down, [the definition of a plant closing] is not triggered.").

in his complaint, instead stating that only approximately *sixty-five* other employees were laid off.[27]

There also is no evidence that at least fifty employees were laid off from plaintiff's work site during a thirty-day period, or that those fifty employees constitute at least 33 percent of the employees at plaintiff's work site.  To the contrary, the evidence demonstrates that only thirty-seven employees were laid off from the Avalon facility on November 4, 2008.  Those thirty-seven employees constituted only 30.6 percent of the 121 employees at the Avalon facility on November 4, 2008.  Therefore, neither of the basic requirements for a "mass layoff" under § 2101(a)(3) has been satisfied.

Further, plaintiff cannot establish that any of Whitesell's other facilities should be combined with the Avalon facility to constitute a "single site of employment," such that all layoffs that occurred at all facilities should be aggregated for purposes of considering whether a "mass layoff" has occurred pursuant to § 2101(a)(3).  Section 2102(d) of the WARN Act provides:

> For purposes of this section, in determining whether a plant closing or mass layoff has occurred or will occur, employment losses for

---

[27] *See* Complaint, at ¶ 7("At or about the time the Plaintiff was terminated, approximately 65 other similarly situated employees who reported to the Florence, Alabama facility were terminated without cause."); ¶ 24 ("Defendant's actions at the facilities resulted in an 'employment loss' as that term is defined by 29 U.S.C. § 2101(a) for at least 33% of its workforce, and at least 50 of its employees . . . .").

2 or more groups at a single site of employment, each of which is less than the minimum number of employees specified in section 2101(a)(2) or (3) of this title but which in the aggregate exceed that minimum number, and which occur within any 90-day period shall be considered to be a plant closing or mass layoff unless the employer demonstrates that the employment losses are the result of separate and distinct actions and causes and are not an attempt by the employer to evade the requirements of this chapter.

29 U.S.C. § 2102(d). The WARN Act does not provide a statutory definition for the term "single site of employment," but Department of Labor regulations define the term as including the following:

(1) A single site of employment can refer to either a single location or a group of contiguous locations. Groups of structures which form a campus or industrial park, or separate facilities across the street from one another, may be considered a single site of employment.

(2) There may be several single sites of employment within a single building, such as an office building, if separate employers conduct activities within such a building. For example, an office building housing 50 different businesses will contain 50 single sites of employment. The offices of each employer will be its single site of employment.

(3) Separate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment. An example is an employer who manages a number of warehouses in an area but who regularly shifts or rotates the same employees from one building to another.

(4) Non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered

a single site.  For example, assembly plants which are located on opposite sides of a town and which are managed by a single employer are separate sites if they employ different workers.

(5) Contiguous buildings owned by the same employer which have separate management, produce different products, and have separate workforces are considered separate single sites of employment.

(6) For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes.

(7) Foreign sites of employment are not covered under WARN. U.S. workers at such sites are counted to determine whether an employer is covered as an employer under § 639.3(a).

(8) The term "single site of employment" may also apply to truly unusual organizational situations where the above criteria do not reasonably apply.  The application of this definition with the intent to evade the purpose of the Act to provide notice is not acceptable.

20 C.F.R. § 639.3(I).  *See also International Union, United Mine Workers v. Jim Walter Resources, Inc.,* 6 F.3d 722, 724 (11th Cir. 1993) ("In the absence of a statutory definition of the term 'single site of employment,' both parties refer to the Department of Labor's interpretative regulations, which provide examples of what should and should not be considered a single site of employment.") (citing 20 C.F.R. § 639.3(i)).

Under this definition, there is no other Whitesell facility that could be aggregated with the Avalon facility to form a "single site of employment," such that the total number of employees laid off at all facilities within a ninety-day period could be considered when determining whether a "mass layoff" occurred under the WARN Act.  Neither the IDC nor the Whitesell Supply facility was contiguous to the Avalon facility, or had the same staff or operational purpose as the Avalon facility. Both the IDC and Whitesell Supply had separate management, produced different products, and maintained separate workforces.  Thus, neither the IDC nor Whitesell Supply should be aggregated with the Avalon facility to determine the total number of persons laid off.  *See United Mine Workers,* 6 F.3d at 727 (holding that four mines were not a "single site of employment" when the "undisputed facts confirm[ed] that the day-to-day management and employee structures at the four mines are fundamentally distinct").

Even if the IDC and Whitesell supply facilities were aggregated with Avalon, however, the aggregation would not result in a significant number of layoffs for purposes of the WARN Act.  Considering the Avalon, IDC, and Whitesell Supply facilities together, a total of only forty-four employees were laid off, and those forty-four employees constituted only 25.6% of the 172 employees at those facilities. Furthermore, when Whitesell's five Alabama salespeople (none of whom were laid

16

off) are added to the equation, only forty-four of 177 employees, or 24.8%, were laid

off.[28]  Those numbers still are not sufficient to trigger the protections of the WARN

Act.

In contrast, if WMI was aggregated with the Avalon facility, the number of

layoffs would be sufficient to trigger the WARN Act.  All nineteen WMI employees

were laid off on November 4, 2008.   Therefore, considering Avalon and WMI

together, a total of fifty-six employees were laid off, and those fifty-six employees

constituted 40% of all of the 140 employees at those two facilities.[29]  Even so, there

is no evidence that WMI and Avalon should be considered a "single site of

employment" under § 2102(d).   The WMI employees worked at various sites

throughout the country.  They did not report for work at Avalon or any other of

defendant's Alabama facilities.  They did not pay Alabama taxes, receive Alabama

---

[28] There is no evidence regarding where the salespeople have their "home base," where they report, or where their assignments are made.  *See* 20 C.F.R. § 639.3(i)(6).  Even assuming all of those salespeople should be considered to have their "home base" at the Avalon facility, however, their inclusion in the analysis would be insignificant, because none of them were laid off during the relevant time period.

[29] If the WMI facility was aggregated with all the other three facilities for which evidence has been provided in this case (*i.e.,* the Avalon, IDC, and Whitesell Supply facilities), the total number of laid-off employees (sixty-three) would constitute 33% of the total number of employees at those facilities (191).  Adding the five Alabama salespeople to the equation would result in only 32% of the total number of employees being laid off, a percentage that is insufficient for WARN Act purposes.  However, there is no need to consider the IDC and Whitesell Supply facilities, or the Alabama salespeople, because, as discussed above, there is no evidence that those facilities, or groups of workers, should be considered part of a "single site of employment" with the Avalon facility.

worker's compensation insurance, or become eligible for unemployment benefits in Alabama.  They did not perform any work at, or related to, any Alabama facility, and they were paid based on their work at other facilities.  Each WMI employee was supervised by a WMI site manager at the specific location where they worked.  The site managers assigned all employee tasks and managed all day-to-day aspects of the WMI employees' employment, including hiring and firing, discipline, and scheduling.  WMI employees never received direction on their day-to-day duties from anyone at the Avalon site, and they never ordered products from the Avalon site.  All of the WMI site managers reported to the WMI manager, who worked at the IDC facility, not at Avalon.  The WMI manager, in turn, reported to the Director of Distribution and Logistics, who also was located at the IDC facility.  Therefore, the WMI employees and Avalon employees cannot be said to have worked at a "single site of employment," according to the regulatory definition of that term.

In summary, there is no evidence that plaintiff was involved in a plant closing or mass layoff, as those terms are defined by WARN Act.  Therefore, summary judgment is due to be granted on plaintiff's claim for failure to provide adequate notice under the Act.

## V. CONCLUSION AND ORDERS

Based on the foregoing, the court concludes there are no genuine issues of

material fact and defendant is entitled to judgment as a matter of law. Accordingly,

defendant's motion for summary judgment is GRANTED, and all of plaintiff's claims

are DISMISSED with prejudice. Costs are taxed to plaintiff. The Clerk is directed

to close this file.

DONE this 10th day of November, 2011.

_____
United States District Judge